IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| SHAWN BRYANT, | ) | CASE NO. 5:19CV2966 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE JOHN R. ADAMS |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Shawn Bryant ("Bryant") seeks judicial review of the final decision of
Defendant Commissioner of Social Security ("Commissioner") denying her application for
Supplemental Security Income ("SSI").  Doc. 1.  This Court has jurisdiction pursuant to 42
U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report
and Recommendation pursuant to Local Rule 72.2(b)(1).

For the reasons stated below, the undersigned recommends that the Commissioner's
decision be **AFFIRMED**.

## I. Procedural History

Bryant filed an application for SSI in June 2016, alleging a disability onset date of
October 24, 2015.  Tr. 37, 200.  She alleged disability based on the following: anxiety,
retinopathy, allergies, depression, bulging disc, deteriorated disc, back contusion and diabetes.
Tr. 228.  After denials by the state agency initially (Tr. 95) and on reconsideration (Tr. 111),
Bryant requested an administrative hearing.  Tr. 147.  A hearing was held before an
Administrative Law Judge ("ALJ") on June 13, 2018.  Tr. 54-94.  In her August 30, 2018,
decision (Tr. 37-47), the ALJ determined that there are jobs that exist in significant numbers in

the national economy that Bryant can perform, i.e., she is not disabled.  Tr. 46-47.  Bryant

requested review of the ALJ's decision by the Appeals Council (Tr. 197) and, on June 13, 2019,

the Appeals Council denied review, making the ALJ's decision the final decision of the

Commissioner.  Tr. 8-11.

## II. Evidence

### A.  Personal and Vocational Evidence

Bryant was born in 1968 and was 47 years old on the date she filed her application.  Tr.

45.  She completed the twelfth grade and completed a 6-month course for word processing

stenography.  Tr. 61.  She last worked in September 2015 as an apple sorter.  Tr. 62.

### B.  Relevant Medical Evidence[1]

On September 15, 2015, an x-ray of Bryant's lumbar spine showed degenerative changes.

Tr. 340.

On December 3, 2015, Bryant visited Ohio Pain and Rehabilitation Specialists for back

pain.  Tr. 305.  Her back pain started several years ago and had recently gotten worse due to

prolonged standing at work.  Tr. 305.  She also endorsed shoulder pain.  Tr. 305.  The treatment

notes commented that a shoulder x-ray was normal.  Tr. 305.  Upon exam, she had diffuse

moderate to marked tenderness in her low back and a restricted lumbar range of motion upon

extension; negative straight leg raise testing; no shoulder tenderness, and tenderness over her left

upper trapezius with pain at the end of her range of motion.  Tr. 306.  She was prescribed

medication.  Tr. 306.  She returned on January 14, 2016; her exam findings were the same.  Tr.

309.

On February 5, 2016, an MRI of Bryant's lumbar spine showed degenerative changes at

---

[1] Bryant only challenges the ALJ's findings that relate to her physical impairments.  Accordingly, only the physical health treatment notes are summarized and discussed herein.

L4-L5 and L5-S1.  Tr. 333.  Specifically, the vertebral body heights were normal, alignment was maintained, she had a mild disc bulge with moderate facet arthropathy, and no significant stenosis.  Tr. 333.

On March 11, 2016, Bryant returned to Ohio Pain and Rehabilitation Specialists and had similar findings on examination as her prior visits.  Tr. 317.

On May 25, 2016, Bryant saw her primary care physician, Dr. Butt, M.D., for treatment for her diabetes.  Tr. 346.  She reported that her blood sugar levels were improving and that she had a job interview the next day.  Tr. 346.  Dr. Butt assessed, among other things, type 2 diabetes mellitus without complications.  Tr. 347.

On August 11, 2016, Bryant returned to Ohio Pain and Rehabilitation Specialists and had similar findings on examination as her prior visits.  Tr. 371.  Lumbar injections were advised but Bryant "remain[ed] reluctant."  Tr. 372.

On August 26, 2016, Bryant returned to Dr. Butt for a follow up reporting that her blood sugar levels were running a little better.  Tr. 375.  On November 30, 2016, Bryant's blood sugars were running high and her insurance had not approved a medication that she had previously taken that had worked very well.  Tr. 448, 375.  She remarked that she did not want the lumbar shots the pain clinic had recommended and she wanted to visit a different pain clinic.  Tr. 448. The treatment note states that she needed a referral to an endocrinologist.  Tr. 448.

On February 20, 2017, Bryant saw a podiatrist, Dr. Henry, D.P.M., complaining of a lot of foot pain that had started a year ago when she had been working at Walmart.  Tr. 468.  She reported having been a diabetic for 6-7 years.  Tr. 468.  Upon exam, she was ambulating normally and had full strength, sensation, and coordination in her feet.  Tr. 469-470.  She had no pain, instability, or tenderness to palpation.  Tr. 470.  Dr. Henry diagnosed diabetic

polyneuropathy and started her on Gabapentin.  Tr. 470.

On March 1, 2017, Bryant saw Dr. Butt for her three-month follow up.  Tr. 501.  She had started seeing an endocrinologist who started her on medication.  Tr. 501.  Her insurance would still not cover her prior medication; they wanted her to use a different medication but she refused.  Tr. 501.  She had an appointment with a new pain management clinic.  Tr. 503.

On March 13, 2017, Bryant returned to her podiatrist for a follow up and reported that the Gabapentin was helping a little.  Tr. 472.  Her dose of Gabapentin was increased.  Tr. 474.

On March 27, 2017, Bryant visited a pain management clinic at Union Hospital complaining of chronic low back pain.  Tr. 579.  Upon exam, she had tenderness to palpation midline in her lumbar region and painful range of motion in both knees.  Tr. 579.  She was assessed with lumbar radiculopathy and joint pain, multiple sites and prescribed tramadol.  Tr. 579.

On June 26, 2017, Bryant retuned to Union Hospital's pain management clinic complaining of back pain radiating to her right hip and leg.  Tr. 580.  The provider discussed facet injections but Bryant was adamant that she was not having shots: "I'm not doing it."  Tr. 580.  She reported that the NSAIDS the prior clinic had put her on were not helpful, nor was the tramadol she had been prescribed at her last visit.  Tr. 580.  The treatment note states that her MRI showed a "moderate amount of arthritis, especially at the lower level of the lumbar spine, and a disc protrusion that is most likely causing her radicular symptomology."  Tr. 580.  Upon exam, she had no pinpoint pain over her cervical, thoracic or lumbar spine; no SI joint pain; and decreased range of motion of her lumbar spine due to pain, especially with extension.  Tr. 580.  She was assessed with spondylosis and lumbar radiculitis.  Tr. 580.  The provider gave her a trial of Norco and commented, "We discussed that she needs to keep moving.  She needs to keep

working, that sitting around doing nothing is not going to make her pain better and that distraction will be one of the better things for her pain, especially since she refuses to [try] injections."  Tr. 580.  She was to follow up in three months.  Tr. 580.

On August 21, 2017, Bryant had a follow up with her podiatrist.  Tr. 508.  She reported that her pain was better; "Only has a little pain when on feet a lot."  Tr. 508.  The doctor commented that she seemed to be doing well and continued her medication.  Tr. 509.

On March 9, 2018, Bryant saw her podiatrist to get new diabetic shoes.  Tr. 510.  She reported that her foot pain was about the same and that it got worse when she was on her feet a lot.  Tr. 510.

On March 15, 2018, Bryant had an initial evaluation with pain management specialist Dr. Sayegh, M.D., for chronic pain.  Tr. 558.  Upon exam, she had positive trigger points and tenderness bilaterally in her lower back paraspinal muscles, moderately decreased sensation in her bilateral lower extremities and feet, mildly positive straight leg raises, and tenderness in her left shoulder with painful, but full, range of motion.  Tr. 558.  Dr. Sayegh listed her diagnoses: low back pain, sprain/strain, sciatica, degenerative disc disease, facet syndrome, left shoulder pain, thoracic pain, spondylosis, and diabetes, and prescribed Norco.  Tr. 559.

On April 12, 2018, Bryant returned to Dr. Sayegh for a follow up.  Tr. 567.  She reported that her medication was not helping.  Tr. 567.  Exam findings were similar to her last visit.  Tr. 567.  Dr. Sayegh prescribed a TENS unit, renewed her medication, and ordered a cervical spine x-ray.  Tr. 567.  The x-ray showed advanced degenerative disc disease at C5-C6 and C6-C7.  Tr. 570.

On June 11, 2018, Bryant returned to Dr. Sayegh complaining of neck pain.  Tr. 582. The medication seemed to be helping.  Tr. 582.  Her exam findings were similar to her prior

visit.  Tr. 582.  Dr. Sayegh continued her medications and ordered an MRI of her cervical spine due to Bryant's reports of increased pain.  Tr. 582.

### C. Opinion Evidence-State Agency Reviewing Physicians

On August 19, 2016, state agency reviewing physician Dr. Mutchler, M.D., reviewed Bryant's records and found that she was capable of performing light work (standing or walking for six hours per workday, sit for six hours per workday, occasionally carry twenty pounds, and frequently carry ten pounds) with postural limitations.  Tr. 105-106.  On December 10, 2016, state agency reviewing physician Dr. Hinzman, M.D., adopted Dr. Mutchler's opinion.  Tr. 122-123.  In support, both physicians cited treatment notes from Bryant's visit to the pain management clinic, lumbar MRI and x-rays, and physical therapy notes, and noted that her diabetes was controlled with medication.  Tr. 105-106, 122-123.

### D.  Testimonial Evidence

#### 1. Bryant's Testimony

Bryant was represented by counsel and testified at the administrative hearing.  Tr. 60. Bryant testified that she lives in a house with her mother.  Tr. 60.  She has a driver's license and is able to drive; she drove herself to the hearing.  Tr. 61.  She described her past work as an apple sorter, which was seasonal, and her job as a cashier at Walmart, which she stopped because she couldn't handle dealing with the customers.  Tr. 62-65.

When asked what her main reason was for not being able to work, Bryant answered that she has problems standing on her feet—they hurt severely.  Tr. 69.  The more she is on her feet and moving around the worse her feet feel.  Tr. 71.  She is constantly moving due to neuropathy and pain in her back or feet.  Tr. 69-70.  She can only walk about 15-20 minutes and standing is worse.  Tr. 70.  Bending and lifting is also worse and she has a hard time lifting a gallon of milk.

Tr. 70.  When asked what problems cause her to have difficulty lifting, Bryant replied that her left arm goes numb and that she has problems with her neck and her back.  Tr. 70.  She can lift a little bit better with her right hand than her left.  Tr. 70.  She can lift a gallon of milk with both hands.  Tr. 82.  She also has problems sitting and problems with her back; she has a broken bone in her back.  Tr. 69.  When asked about the broken bone in her back, Bryant explained that she thought it occurred in 2014 when she was carrying her grandson and slipped on ice and fell.  Tr. 70-71.

Bryant takes medications for her pain: Gabapentin for her foot pain and hydrocodone for her back.  Tr. 71.  Her medications have been slightly effective but they make her drowsy.  Tr. 71.  She also has had physical therapy for her back and neck, which did not help, and no other therapy for her feet pain.  Tr. 71.  She has been wearing diabetic inserts in her shoes for the last two years but they don't help at all.  Tr. 72.  She did not go to pain management for four months because her insurance changed; during that time she did notice a difference in how she felt without her medication.  Tr. 72.  They wanted to give her back injections but Bryant was not comfortable having them put needles in so close to her spine.  Tr. 85.

Bryant recently had a cervical spine x-ray that showed severe degenerative arthritis in her neck and she is awaiting insurance approval for an MRI.  Tr. 73.  She had noticed problems with her neck in the past, but only recently got an x-ray because her pain management clinic wanted to focus on one thing at a time.  Tr. 73.  She experiences left arm numbness and when she uses her arms a lot she gets a burning, stabbing pain in her shoulder area.  Tr. 71, 73-74.  When her arm goes numb her hand also goes numb and she drops things.  Tr. 74.

Bryant is able to care for herself (showering, dressing, etc.), although different movements will hurt.  Tr. 75.  She can do some household chores, like dishes, laundry (not

7

carrying baskets), vacuuming, cooking, and grocery shopping. Tr. 75. She does dishes for ten minutes at a time and then sits down for 5-10 minutes because her back hurts. Tr. 79-80. She sits and stands while cooking. Tr. 80. She can walk around the grocery store for about 15 minutes before she is in a lot of pain. Tr. 79-80. If she is not done grocery shopping after 15 minutes she keeps shopping, but by the time she gets to her car she has problems sitting down. Tr. 80-81. Also, her feet burn. Tr. 81. She likes to go fishing, camping and hiking, although she no longer hikes. Tr. 75-76. She can still camp and fish if she is careful with her movements. Tr. 76.

Some days, Bryant's pain is so bad that she can't do anything. Tr. 83. On those days, the pain is in her back and hip area. Tr. 83. This happens about once a week. Tr. 83. Her pain medication doesn't make it go away, it just dulls it a little bit. Tr. 83. On those days she just sits or lies down. Tr. 83-84. She naps twice a day because her medications make her drowsy. Tr. 84. She has problems sleeping at night because of pain and her legs start "jumping." Tr. 84. She only gets about 4 or 5 hours of sleep at night and does not feel rested when she wakes up. Tr. 84.

### 3. Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing. Tr. 86-93. The ALJ discussed with the VE Bryant's past relevant work as an apple checker or sorter. Tr. 86-87. The ALJ asked the VE to determine whether an individual of Bryant's age, education, and vocational history could perform her past work or any other work if she had the limitations subsequently assessed in the ALJ's RFC determination. Tr. 87-89. The VE answered that such an individual could not perform Bryant's past work but could perform the following jobs with significant numbers in the national economy: electrical accessory assembler; plastic hospital products assembler; and

8

inspector/hand packager.  Tr. 89-90.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is

capable of performing other work that exists in significant numbers in the
national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy.  *Id.*

### IV. The ALJ's Decision

In her August 30, 2018, decision, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since June
   22, 2016, the application date.  Tr. 39.

2. The claimant has the following severe impairments: degenerative disc
   disease of the lumbar and cervical spine, osteoarthritis of the lumbar
   spine, radiculopathy of the bilateral lower extremities, obesity, diabetes
   mellitus with diabetic polyneuropathy, social anxiety disorder, and
   affective disorder.  Tr. 39.

3. The claimant does not have an impairment or combination of
   impairments that meets or medically equals the severity of one of the
   listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 40.

4. The claimant has the residual functional capacity to perform light work as
   defined in 20 CFR 416.967(b) except she can stand and walk for four
   hours in an eight-hour workday; she can occasionally climb ladders,
   ropes, or scaffolds, and can frequently climb ramps and stairs; she can
   frequently stoop, kneel, crouch or crawl; she can understand, remember,
   and carry out instructions to perform detailed, but not complex tasks,
   meaning that she can perform[] semi-skilled work, but not at a production
   rate pace, such as assembly line work, and not with strict production
   quotas; she can interact superficially with supervisors and co-workers,
   with superficial defined to mean no sales, arbitration, negotiation,
   confrontation, conflict resolution, or responsibility for the safety or

---

[2] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations
to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20
C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to
the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

welfare of others; she cannot interact with the general public as part of her job duties, but can work in an environment with occasional exposure to the general public; and she can adapt to occasional changes in the work setting, so long as those changes are explained in advance and are implemented gradually.  Tr. 41.

5.   The claimant is unable to perform any past relevant work.  Tr. 45.

6.   The claimant was born in 1968 and was 47 years old, which is defined as a younger individual age 18-49, on the date the application was filed. The claimant subsequently changed age category to closely approaching advanced age.  Tr. 45.

7.   The claimant has at least a high school education and is able to communicate in English.  Tr. 46.

8.   Transferability of job skills is not an issue because the claimant's past relevant work is unskilled.  Tr. 46.

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 46.

10.  The claimant has not been under a disability, as defined in the Social Security Act, since June 22, 2016, the date the application was filed.  Tr. 47.

## V. Plaintiff's Arguments

Bryant argues that the ALJ's RFC determination is not supported by substantial evidence.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681

(6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

 Bryant argues that the ALJ erred when she found that Bryant is capable of performing light work.  Doc. 13, p. 5.  She asserts that the ALJ "misconstrues, or wholly ignores much of the evidence that would support a very different conclusion."  Doc. 13, p. 6.  Specifically, Bryant submits that the record contains 31 exhibits containing medical records, but the ALJ only cited three of them.  And those three exhibits (Exhibits 12F, 18F and 28F), Bryant asserts, are the psychological consultative examiner's report, notes from the podiatrist, and an x-ray of her cervical spine.[3]  Doc. 13, p. 7.  She complains that the ALJ did not cite her lumbar MRI, her abnormal exam findings in her pain management records that correlate with the MRI, or the findings in Dr. Butt's notes "suggesting severely uncontrolled diabetes."  Doc. 13, p. 8.

As an initial matter, the ALJ cited more than three exhibits.[4]  Next, while ALJs are required to consider all the evidence, they are not required to discuss or cite all the evidence.  *See Boseley v. Comm'r of Soc. Sec. Admin.*, 397 Fed. App'x 195, 199 (6th Cir. 2010) ("Neither the ALJ nor the Council is required to discuss each piece of data in its opinion, so long as they consider the evidence as a whole and reach a reasoned conclusion[,]" citing *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 507–08 (6th Cir. 2006)).  Thus, the ALJ's failure to cite or discuss certain record evidence, without more, is not error.

Moreover, although the ALJ did not cite Bryant's lumbar MRI or her abnormal exam findings from her pain management visits, it is clear that the ALJ considered this evidence.  The

---

[3] The ALJ cited Bryant's psychological consultative exam report to illustrate her reported activities of daily living. Tr. 44.

[4] The ALJ also cited Exhibits 7, 14, 15, 19, 22, 23, 26, and 29.  Tr. 39, 44.  And two exhibits (Exhibits 8, 9) are simply notes stating that the provider has no records.

ALJ listed Bryant's lumbar-related issues as "severe" impairments.  Tr. 39 (ALJ's decision listing lumbar degenerative disc disease, osteoarthritis of the lumbar spine, and radiculopathy of the bilateral lower extremities as "severe" impairments).  The ALJ considered both her back and neck impairments at step three and found that the evidence did not show that she met or equaled Listing 1.04, Disorders of the spine.  Tr. 40.  Thereafter, the ALJ cited Bryant's reports of back pain and her history of diagnoses related to her lumbar spine.  Tr. 42.  She explained that diagnostic tests and physical exam findings had been largely normal and that her daily activities indicated a greater level of functioning than alleged.  Tr. 44.  In support, she cited a 2017 exam in which Bryant had full lower extremity strength and sensation.  Tr. 44.  And the ALJ commented upon her conservative treatment.  Tr. 45.  Although Bryant cites pain management records from 2018 showing tenderness of her paraspinal muscles and moderately diminished sensation and tendon reflexes (Doc. 13, p. 8 (citing Tr. 558, 567, 582)),[5] the ALJ stated that, overall, her exam findings were "largely normal," not that they were entirely normal.

Furthermore, the ALJ relied upon the state agency reviewing physicians' opinions, the only opinion evidence in the record.  The ALJ wrote,

> [S]ome weight is given to the State agency medical consultants' physical assessments, who limited the claimant to [a] range of light level work, but with standing/walking for six hours per workday instead of four hours as described in the residual functional capacity…These opinions were based on information contained in the record at the time of the State agency reconsideration determination in this case, and no medical records generated or provided after that date were considered by the state examiners.  However, additional medical evidence received in the course of developing the claimant's case for review at the administrative hearing level justifies a conclusion that the claimant's impairments are more limiting than was concluded by the state examiners.  Nevertheless, the undersigned agrees with the DDS consultants that the claimant's physical impairments are not disabling for the reasons listed above, including her generally benign diagnostic test results and physical exam findings, her conservative treatment history, and her varied activities of daily living that indicate a greater level of functioning than alleged at the hearing.

---

[5] Bryant also asserts that the pain management notes show a reduced range of motion, but the reduced range of motion referenced in the notes refers to her shoulder, not her lumbar spine.

Tr. 45.  Notably, the state agency reviewers, in turn, relied heavily on record evidence of Bryant's lumbar impairments.  Tr. 105-106, 122-123 (state agency reviewing physician's extensive citation to pain management clinic exams, lumbar MRI and x-rays, and physical therapy notes).  The ALJ referenced this evidence relied upon by the state agency reviewing physicians and, after considering the more recent evidence, further limited Bryant to four hours of standing and walking rather than six.  In short, the ALJ clearly considered the evidence as a whole and reached a reasoned conclusion.  *See Boseley*, 397 Fed. App'x at 199.

Finally, Bryant's assertion that the ALJ failed to cite the findings in Dr. Butt's notes "suggesting severely uncontrolled diabetes" (Doc. 13, p. 8) fails for the additional reason that Dr. Butts did not diagnose Bryant with uncontrolled diabetes.  The ALJ considered Bryant's diabetes: she found it a severe impairment; considered it at step three and found that Bryant's diabetes did not meet or equal Listing 9.00 (Endocrine disorders) or Listing 11.14 (Peripheral neuropathies); and discussed the functional limitation alleged by Bryant related to her diabetes mellitus—her diabetic polyneuropathy (Tr. 43), a symptom that Bryant subsequently reported was controlled by medication.  Tr. 508-509.

In sum, the ALJ's failure to cite certain evidence regarding Bryant's lumbar-related and diabetic impairments was not error.  The ALJ's decision is supported by substantial evidence and must, therefore, be affirmed.  *See Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

## VII. Conclusion

For the reasons set forth herein, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

Dated: October 22, 2020

/s/Kathleen B. Burke
Kathleen B. Burke
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).